TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00149-CV






Southern Plastics, Inc., Appellant


v.


Susan Combs, Comptroller of Public Accounts of the State of Texas,

and Greg Abbott, Attorney General of the State of Texas, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-06-000047, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 This is an appeal from a summary judgment in favor of the Comptroller in a suit to
recover a sales tax refund. We will affirm the judgment.


BACKGROUND

 At relevant times, appellant Southern Plastics, Inc., has operated a plant near Kilgore,
Texas, where it manufactures plastic closures, such as caps and lids, which it sells to companies
that manufacture and sell beverages, personal care products, and other household products. Southern
Plastics manufactures the plastic closures by loading raw materials, such as resins and colorants,
into molding machines, heating them, and injecting them into molds. Southern Plastics also
manufactures liners for the insides of some of the plastic closures. It bonds a type of paper called
"pulp" to foil or wax paper in a machine called a "laminator," uses a die to cut or punch out pieces
of the laminated paper in the size and shape of the closure, and then inserts the liner into the closure. 
 The Comptroller conducted a sales tax audit of Southern Plastics for the period
between November 1, 1999, and October 31, 2002. During this period, Southern Plastics contracted
with the City of Kilgore to periodically remove and dispose of certain waste from its plant. It is
undisputed that there were essentially four sources or categories of waste removed by the City or its
subcontractors:



 Waste from the process of manufacturing the plastic closures and liners, including scrap
plastic, remnants of pulp, and "skeletons" or "webbing" of the laminated sheets from which
the closure liners were punched.

 Waste from discarded wrapping or packaging materials (e.g., cardboard boxes and cores,
wooden pallets, banding, and shrink wrap) it received with incoming shipments of raw
materials.

 Waste from damaged or unusable wrapping or packaging materials used to prepare its
finished products for shipment to customers, such as damaged boxes, damaged pallets, and
excess shrink wrap.

 Waste from Southern Plastics's offices, including shredded paper and cardboard boxes that
held copy paper, and waste from food and beverages consumed by employees in a break
room area.




Southern Plastics commingled these categories of waste before removal. It paid a single charge to
the City for removal of the commingled waste that did not differentiate among the relative amounts
contributed from each of the four waste categories. Southern Plastics also paid sales tax on the full
amount of each such charge during the audit period. These sales tax payments totaled $4,872.78 for
the audit period.

 Subsequently, Southern Plastics requested from the Comptroller a refund of all
the sales taxes it had paid for the City's waste removal services during the audit period. It claimed
the taxes had been paid in error because the waste was "industrial solid waste" for which removal
costs are not subject to the sales tax. See Tex. Tax Code Ann. § 151.0048(a)(3)(b) (West 2008);
34 Tex. Admin. Code § 3.356(a)(3)(E) (2009) (Tex. Comptroller of Pub. Accts.). The Comptroller
denied the requested refund and Southern Plastics's ensuing motion for rehearing. Southern Plastics
then filed suit under chapter 112 of the tax code seeking a refund. See Tex. Tax Code Ann.
§§ 112.151-.155 (West 2008). It also asserted a claim under section 2001.038 of the administrative
procedures act for a declaration that the Comptroller's interpretation of its rule defining "industrial
solid waste" was itself a "rule" under the APA and invalid because the Comptroller had failed
to comply with the APA's rulemaking requirements in adopting it. See Tex. Gov't Code Ann.
§ 2001.038 (West 2008).

 Southern Plastics and the Comptroller (1) filed cross-motions for summary judgment
under the "traditional" standard that joined issue on whether Southern Plastics was entitled to a
refund. In its motion, Southern Plastics also sought summary judgment on its declaratory-judgment
claim under the APA. The district court granted the Comptroller's summary-judgment motion,
denied Southern Plastics's motion, and rendered final judgment for the Comptroller as to all of
Southern Plastics's claims. This appeal followed.




ANALYSIS

 In three issues on appeal, Southern Plastics contends that the district court erred in
rendering summary judgment for the Comptroller on Southern Plastics's refund and APA claims
and in denying it summary judgment on those claims.


Standard of review

 We review the district court's summary judgment de novo. Valence Operating Co.
v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life & Accident Ins. Co. v. Knott,
128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues
of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c).
When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and
we indulge every reasonable inference and resolve any doubts in the non-movant's favor. Valence
Operating Co., 164 S.W.3d at 661; Knott, 128 S.W.3d at 215.

 When parties file cross-motions for summary judgment on overlapping issues and
the trial court grants one motion and denies the other, an appellate court should review the summary-judgment evidence supporting both motions and determine all questions presented. FM Props.
Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court "should
render the judgment that the trial court should have rendered." Id.

 Our review of the district court's summary-judgment rulings turns on construction
of the tax code and the Comptroller's rules. Statutory construction presents a question of law that
we review de novo. See State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective
in statutory construction is to give effect to the legislature's intent. Id. We seek that intent "first
and foremost" in the statutory text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). 
We rely on the plain meaning of the text, unless a different meaning is supplied by legislative
definition or is apparent from context, or unless such a construction leads to absurd results. City of
Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008); see Tex. Gov't Code Ann. § 311.011
(West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules
of grammar and common usage"). However, with regard to a statute that an agency is charged
with enforcing, we give "serious consideration" to the agency's construction of it, so long as that
construction is reasonable and consistent with the statutory language, and this is particularly
true when the statute involves complex subject matter within the agency's area of expertise. See
First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 632 (Tex. 2008); cf. Rylander v. Fisher Controls
Int'l, Inc., 45 S.W.3d 291, 302 (Tex. App.--Austin 2001, no pet.) (courts "do not defer to
administrative interpretation in regard to questions which do not lie within administrative expertise
or deal with a nontechnical question of law").

 "We construe administrative rules, which have the same force as statutes, in the
same manner as statutes." Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 254 (Tex. 1999).
"Unless the rule is ambiguous, we follow the rule's clear language." Id. However, we defer to an
agency's interpretation where there is vagueness, ambiguity, or room for policy determinations in
the regulation--i.e., unless the administrative interpretation is "plainly erroneous or inconsistent with
the regulation." See id. at 254-55 (quoting Public Util. Comm'n v. Gulf States Util. Co., 809 S.W.2d
201, 207 (Tex. 1991)).


Refund claim

 As the plaintiff in a tax refund case, Southern Plastics had the burden of proving,
by a preponderance of the evidence, that it is entitled to a refund of the sales tax it paid on the
City's waste removal services because those services were not subject to tax. GATX Terminals
Corp. v. Rylander, 78 S.W.3d 630, 634-35 (Tex. App.--Austin 2002, no pet.). In its first issue,
Southern Plastics argues that it is entitled to summary judgment on its refund claim "[b]ecause the
uncontroverted evidence shows that all but a de minimis portion of Appellant's waste meets the
Comptroller's definition of industrial solid waste." Alternatively, in its third issue, Southern Plastics
contends that the Comptroller did not establish her entitlement to summary judgment on that claim. 
 Section 151.0101, subsection (a) of the tax code enumerates the "taxable services"
that are subject to the Texas sales and use tax. See Tex. Tax Code Ann. § 151.0101(a) (West 2008). 
Subsection (b) of that section provides that "[t]he comptroller shall have exclusive jurisdiction
to interpret Subsection (a) of this section." Id. § 151.0048(b). Among the "taxable services" listed
in subsection (a) are "real property services." See id. § 151.0101(a)(11). The tax code defines
"real property services" to include such services as landscaping, lawn or tree care, surveying,
janitorial services, and:


the removal or collection of garbage, rubbish, or other solid waste other than


 (A) hazardous waste;

 

 (B) industrial solid waste;

 

 (C) waste material that results from an activity associated with the exploration,
development, or production of oil, gas, geothermal resources, or any other
substance or material regulated by the Railroad Commission of Texas under
Section 91.101, Natural Resources Code;

 

 (D) domestic sewage or an irrigation return flow, to the extent the sewage
or return flow does not constitute garbage or rubbish; and

 

 (E) industrial discharges subject to regulation by permit issued pursuant to
Chapter 26, Water Code. . . .



Id. § 151.0048(a)(3) (West 2008) (emphasis added). 

 Comptroller rule 3.356 addresses the taxability of real property services. See
34 Tex. Admin. Code § 3.356. Rule 3.356 defines "garbage or other solid waste" and "industrial
solid waste" as follows:


 (3) Garbage or other solid waste--Waste; refuse; sludge from a waste treatment
plant, a water supply treatment plant, or an air pollution control facility; and
other discarded material, including solid, liquid, semisolid, or contained
gaseous material, resulting from residential, industrial, municipal,
commercial, mining, and agricultural operations, and resulting from
community and institutional activities. The term does not include any of the
following:


* * * 


 (E) industrial solid waste, as that term is defined in Health and Safety
Code, Chapter 361, with the exception of industrial solid waste
which meets the definition of garbage or municipal solid waste.

 


Id. § 3.356(a)(3)(E). Chapter 361 of the health and safety code is the Solid Waste Disposal Act. See
Tex. Health & Safety Code Ann. § 361.001 (West 2001). The Solid Waste Disposal Act defines
"industrial solid waste" as:


 solid waste resulting from or incidental to a process of industry or manufacturing, or
mining or agricultural operations.



Id. § 361.003(16) (West 2001). The parties' dispute centers primarily on the proper interpretation
of "resulting from or incidental to a process of industry or manufacturing," as incorporated into
rule 3.356(a)(3)(E). (2) See id. (emphasis added).

 Southern Plastics argues that the plain meaning of waste "resulting from" or
"incidental to" its manufacturing process encompasses not only its waste from the actual
manufacturing of plastic closures and liners, (3) but also discarded wrapping and packaging from
its incoming and outgoing shipments, and even its office waste. It cites definitions from dictionaries
and case law to the effect that "resulting from" means a "consequence" or "effect of," or "arising
from," while "incidental to" means "closely related to" or even "peripheral." (4) In Southern Plastics's
view, "waste generated by [its] process of sorting, segregating, storing and using its raw materials
and supplies and waste generated by its process of wrapping and packaging finished products for
shipping to customers" fall within those definitions. Additionally, Southern Plastics observes that
the Texas Commission on Environmental Quality--the state agency charged with enforcing
and implementing the Solid Waste Disposal Act--apparently considers all waste from a
manufacturing plant to be "industrial solid waste" that must be classified according to TCEQ
regulations. See 30 Tex. Admin. Code § 335.508(3) (2009) (Tex. Comm'n on Envtl. Quality) (all
"plant trash," including trash from "facility offices" and "cafeteria," constitutes Class 2 industrial
solid waste); Tex. Comm'n on Envtl. Quality, Instructions for Completing the Notification for
Hazardous or Industrial Waste Management Form (TCEQ-00002) 22 (2009) (available at
www.tceq.state.tx.us/assets/public/permitting/rrr/forms/0002inst.pdf) ("all wastes . . . even office
trash" produced by a facility that "make[s] a product for wholesale according to an organized plan
and with a division of labor, change[s] materials by processing them, or substantially support[s] either
of those activities" are "industrial waste."). Thus, Southern Plastics reasons, these wastes are all non-taxable "industrial solid waste." Southern Plastics concedes, however, that food waste from its
employee break room was taxable because it constituted "garbage" under the Solid Waste Disposal
Act. See Tex. Health and Safety Code Ann. § 361.003(10) (West 2001); 34 Tex. Admin. Code
§ 3.356(a)(3)(E). (5) This taxable waste can be disregarded, Southern Plastics asserts, because the
summary-judgment evidence conclusively establishes that it was de minimis--less than one percent
of the plant's total waste stream during the audit period. (6)

 The Comptroller counters, first, that Southern Plastics failed to comply with the
administrative or recordkeeping requirements for claiming that any portion of its waste during
the audit period was non-taxable. Rule 3.356 generally requires persons providing "garbage or
other solid waste" services to obtain a tax permit and collect and remit sales and use taxes on all
charges for such services. 34 Tex. Admin. Code § 3.356(b). Subsection (h) of the rule sets forth the
procedure for taxpayers to assert their rights against having sales tax assessed on collection of waste
that is wholly or partly non-taxable:


 (h) Garbage collection services that may be excluded from tax. Persons providing
collection services for customers having waste excluded from the definition of
"garbage or other solid waste" may accept an exemption certificate from the customer
in lieu of tax. The exemption certificate must state the type of waste being excluded,
and that either the waste to be collected is totally excludable or that the customer has
both taxable and nontaxable waste and the customer will be responsible for accruing
tax on that portion of the charge which represents taxable services. The customer may
use any reasonable allocation for reporting tax on taxable services which is
supportable by books and records. 



Id. § 3.356(h). The Comptroller points out that Southern Plastics did not present the City with an
exemption certificate, but paid sales tax on the entirety of the waste removal services the City
provided during the audit period. See id. The Comptroller further asserts that Southern Plastics
cannot, as a matter of law, "show how much of the waste it generated during the audit period was
industrial solid waste and how much was not" (i.e., a "reasonable allocation" under 3.356(h)) because
the summary-judgment evidence conclusively establishes that Southern Plastics did not maintain any
"books and records" that could support its proposed tax treatment of the City's waste removal
services. See id.; see also Tex. Tax Code Ann. § 111.0041 (West 2008) (requiring taxpayer to retain
records for inspection by the comptroller or the attorney general for period of four years). (7)

 Additionally, the Comptroller asserts that Southern Plastics's office waste and
packaging waste from incoming or outgoing shipments are not "resulting from" or "incidental to" the
plant's manufacturing processes as she has interpreted rule 3.356(a)(3)(E). (8) In several prior
rulings and policy statements, the Comptroller has interpreted "industrial solid waste" under
rule 3.356(a)(3)(E) to be limited to waste generated by the "actual manufacturing process" and
to exclude shipping refuse or office waste. (9) The Comptroller explains that her interpretation is
based on what she perceives as the public policy underlying the statutory exclusion of "industrial solid
waste," "hazardous waste," and other exclusions from taxable "garbage, rubbish, or other
solid waste"--to avoid imposing a tax disincentive against desirable waste clean-up activities. See
Tex. Tax Code Ann. § 151.0048(a)(3). The core legislative concern reflected in these provisions, in
the Comptroller's view, was with hazardous, potentially hazardous, or other waste perceived to create
pronounced environmental threats, as is frequently true of manufacturing waste. See House Research
Organization, Bill Analysis, Tex. H.B. 1814, 72d Leg., R.S. (1991) ("[T]o avoid imposing a tax
disincentive on desirable waste-disposal activities," taxable waste removal does not include removal
of "hazardous waste, industrial solid waste, domestic sewage and certain other wastes"). By contrast,
the Comptroller maintains, the legislature manifested its intent in section 151.0048(a)(3) that ordinary
"garbage" and "rubbish" be taxed. The Comptroller also emphasizes that section 151.0048(b) of the
tax code grants her "exclusive jurisdiction" to construe the provisions defining taxable services, and
that her construction of statutory or rule language defining taxable services should control over that
of the TCEQ in the event of a conflict.

 Besides condemning the Comptroller's interpretation of "industrial solid waste" as
inconsistent with the plain text of rule 3.356(a)(3)(E), Southern Plastics questions both the
consistency with which the Comptroller has applied her interpretation and her underlying rationales. 
It cites language from some of the Comptroller's policy statements and rulings suggesting an
erroneous view that the Solid Waste Disposal Act does not regulate any waste from manufacturing
facilities other than hazardous waste and industrial solid waste resulting from actual manufacturing
activities. (10) As for the Comptroller's "exclusive jurisdiction" to construe the definitions of "taxable
services," Southern Plastics contends that the Comptroller has exercised her jurisdiction to adopt
a statutory definition of "industrial solid waste" from the Solid Waste Disposal Act that the TCEQ
or its predecessors have interpreted and administered for decades. Having opted to adopt this
definition, Southern Plastics suggests, the Comptroller is bound to follow it. See Rodriguez,
997 S.W.2d at 255 (agency is bound to follow its own rules and procedures).

 Regarding rule 3.356(h)'s record-keeping requirement, Southern Plastics cites 
summary-judgment evidence of invoices and receipts it received in connection with the City's
waste removal services during the audit period. However, these documents reflect only that Southern
Plastics periodically paid a fee to the City or its subcontractors for waste removal services, but do not
indicate the composition of the plant's waste stream. The Comptroller presented summary-judgment
evidence that, during her audit, Southern Plastics was unable to provide her auditor any other books
or records regarding its waste stream other than some photographs of its waste. (11) As evidence of the
composition of its waste stream during the audit period, Southern Plastics has relied primarily on two
separate one-week studies performed by company employees several years after the audit period. The
first of the studies was performed by Ed Casto, Maintenance and Process Engineer for Southern
Plastics. Casto summarized his findings in an affidavit dated May 23, 2005. The second study, which
covered a period between December 4 and 12, 2006, was performed by Ron Smith, Logistics Manager
for Southern Plastics. Smith summarized his findings in an affidavit dated February 23, 2007. 
According to these affidavits, each study determined that, during the period of the study, less than
one percent of the Southern Plastics waste removed by the City came from the office, administrative,
or break room areas. Smith further determined that less than three percent of total waste collected
by the City during his study came from discarded packaging or wrapping from in-bound raw
materials. Both Castro and Smith averred that the processes Southern Plastics used to manufacture
plastic closures during their study was "substantially" the same as or similar to that used during
the audit period.

 Southern Plastics also presented the May 2007 deposition testimony from John Steven
Clarke, another employee who was familiar with Southern Plastics's manufacturing processes,
as well as Smith's deposition. Clarke testified that waste generated from the packaging of
outgoing shipments comprises about one-half of one percent of Southern Plastics's total waste. He
added--considering that office or administrative waste accounts for less than one percent of waste,
and waste from incoming shipments accounted for three percent--that waste from the manufacturing
process itself accounts for over ninety-five percent of Southern Plastics's total waste. Clarke further
testified that Southern Plastics had substantially the same volume of business, nearly the same number
of employees, and the same number of machines in operation during the audit period and the one-week studies as it did at the time of his deposition. On the other hand, Clarke and Smith both
acknowledged that the volume and composition of Southern Plastics's waste stream varies somewhat
from week-to-week and seasonally.

 The Comptroller points out that Southern Plastics's refund claim hinges not on proof
of what its waste stream actually was during the audit period, per se, but whether Southern Plastics's
proposed tax treatment of its waste removal is "reasonable" and "supportable by books and records"
as required by rule 3.356(h). See 34 Tex. Admin. Code § 3.356(h). As for the two studies on which
Southern Plastics primarily relies, the Comptroller urges that "all these studies prove is what type and
how much waste Southern Plastics generated during the two weeks that were studied"--which, she
adds, were conducted years after the audit period. She characterizes the studies as narrow "single
point in time checks" that provide no objective means of verifying the actual waste stream at that
time, much less during the audit period, further observing that both Smith and Clarke admitted that
Southern Plastics's waste stream had weekly and seasonal variations.

 The Comptroller's construction of the "books and records" requirement of
rule 3.356(h) to preclude reliance on Southern Plastics's two after-the-fact, one-week studies (or
similar attempts to replicate the composition of Southern Plastics's waste stream during the audit
period) is not plainly erroneous or inconsistent with the regulation. The Comptroller has construed
"supportable by books and records" to require a more contemporaneous, precise and objective record
of Southern Plastics's waste stream during the audit period that would enable her to verify the basis
for the company's claims that all or part of its waste was non-taxable. The Comptroller acted within
her discretion here in determining that Southern Plastics's documentation was insufficient to satisfy
the rule's requirements. See Gulf States Utils. Co., 809 S.W.2d at 207 (agency's interpretation of its
own rules is entitled to deference unless it is plainly erroneous); see also Tex. Tax Code Ann.
§ 111.0041 (four-year record retention requirement).

 On the other hand, we conclude that Southern Plastics has raised a fact issue as to
whether "books and records" exist, or existed during the audit period, that would demonstrate that
all waste from its Kilgore plant during the audit period was classified as Class 2 industrial solid waste
by the TCEQ. Southern Plastics presented the affidavit of Mark Galliardt, its Environmental Health
and Safety Manager. Galliardt explained that his job responsibilities had included ensuring that
Southern Plastics's Kilgore plant complied with all state environmental regulations during the audit
period. Galliardt testified that, in compliance with the Solid Waste Disposal Act and related rules,
Southern Plastics filed a "Notice of Registration" (NOR) with the TCEQ before the audit period and
periodically updated it to reflect any changes in its waste stream. According to Galliardt, the waste
removed by the City was "classified as Class 2 industrial solid waste under TCEQ regulations and
guidelines." (12) He elaborated that the plant also generated other types of waste, some classified as
hazardous waste, that were removed or disposed of by entities other than the City. Galliardt added
"Because of the relatively small amount of hazardous waste generated by [Southern Plastics] at this
plant, it is designated as a 'conditionally exempt small quantity generator' under TCEQ regulations. 
As such, it is not required to submit regular reports to TCEQ regarding its waste disposal activities"
or "to maintain records regarding its Class 2 industrial solid waste disposal activities." (13) 

 For these reasons, our disposition of Southern Plastics's challenge to summary
judgment on its refund claim turns on whether the status of its waste during the audit period as
Class 2 industrial solid waste under TCEQ regulations controls whether the waste is non-taxable
"industrial solid waste" under Comptroller rule 3.356(a)(3)(E). In that regard, rule 3.356(a)(3)(E)'s
reference to "industrial solid waste, as that term is defined in Health and Safety Code, Chapter 361
. . . ," is susceptible to at least two interpretations. It could mean that the definition of "industrial
solid waste" under rule 3.356(a)(3)(E) tracks whatever the term means in the health and safety code,
as interpreted and applied in the context of state environmental regulation. This is the construction
advocated by Southern Plastics. Alternatively, "industrial solid waste, as that term is defined in
Health and Safety Code, Chapter 361 . . . ," could mean that the Comptroller intended to incorporate
the language of that statutory definition, which she would then interpret and apply, as a matter of
tax policy and administration, and potentially in a manner diverging from its application in the
environmental regulatory arena. This is essentially the construction advanced by the Comptroller. 
We cannot conclude that the Comptroller's construction is plainly erroneous or inconsistent with
the regulation, especially against the backdrop of tax code section 151.0048(b)'s mandate that the
Comptroller have "exclusive jurisdiction" to interpret the statutory definitions of taxable services. 
See Tex. Tax Code Ann. § 151.0048(b). Although rule 3.356(a)(3)(E) may reflect the Comptroller's
desire for guidance from the environmental regulatory arena concerning the types of waste for
which removal should be incentivized by tax policy, (14) its language does not plainly disclaim authority
over the ultimate question of whether that waste is taxed. Similarly, we cannot conclude that the
Comptroller's interpretation that not all of Southern Plastics's Class 2 industrial solid waste "results
from" or is "incidental to" the plant's manufacturing processes under rule 3.356(a)(3)(E) is plainly
erroneous or inconsistent with the regulation. At a minimum, the Comptroller does not exceed her
authority in concluding that Southern Plastics's office waste and break room waste does not fall
within this definition. 

 Accordingly, the district court did not err in granting summary judgment for the
Comptroller as to Southern Plastics's tax refund claim. We overrule Southern Plastics's first and
third issues.


Section 2001.038 claim

 In its second issue, Southern Plastics argues that it is entitled to a declaration
under the Administrative Procedure Act that the Comptroller invalidly attempted to amend
Comptroller Rule 3.356. Southern Plastics, however, alleged no controversy beyond whether it is
entitled to a refund for taxes paid during the audit period. The district court did not err in granting
summary judgment on this claim. See Universal Painting Co. v. Premier Victorian Homes, Inc.,
73 S.W.3d 283, 296 (Tex. App.--Houston [1st Dist.] 2001, pet. denied) ("There is no basis for
declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a
judicial declaration would add nothing to what would be explicit or express in a final judgment for
the enforceable remedy.").

 We overrule Southern Plastics's second issue.


CONCLUSION

 Having overruled Southern Plastics's issues on appeal, we affirm the judgment of
the district court.


 

 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: July 1, 2009



 
1. Because the interests of the Comptroller and the Attorney General in the litigation align,
we hereafter refer to them collectively as the "Comptroller." See Tex. Tax Code Ann. § 112.053
(West 2008) (requiring the Comptroller and the Attorney General to be named as defendants in suit
brought pursuant to chapter 112 of the tax code). 
2. There is no dispute that Southern Plastics's waste during the audit period was "solid
waste." The Act's definition of "solid waste" generally includes "garbage, rubbish, refuse, sludge
from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other
discarded material, including solid, liquid, semisolid, or contained gaseous material resulting
from industrial, municipal, commercial, mining, and agricultural operations and from community
and institutional activities." Tex. Health & Safety Code Ann. § 361.003(34), (35) (West 2001). 
"Garbage" under the Act is defined much more narrowly than in rule 3.356(a)(3): "solid waste that
is putrescible animal and vegetable waste materials from the handling, preparation, cooking,
or consumption of food, including waste materials from markets, storage facilities, and the handling
and sale of produce and other food products." Id. § 361.003(10). Beyond that distinction, the
Act's definition of "solid waste" is largely identical to rule 3.356(a)(3)'s definition of "garbage or
other solid waste." Thus, rule 3.356(a)(3) implies that "industrial solid waste" is a subcategory of
"garbage or other solid waste."


 For this reason, rule 3.356(a)(3)'s provision making taxable "industrial solid waste" that
"meets the definition of garbage or municipal solid waste" presumably cannot refer to the preceding
definition of "garbage or other solid waste" from which "industrial solid waste" is excluded;
otherwise, the "industrial solid waste" exclusion would be a circular nullity. See Fleming Foods of
Tex., Inc. v. Rylander, 6 S.W.3d 278, 284 (Tex. 1999) (statutes are construed according to their plain
language unless doing so would lead to absurd results). Southern Plastics argues that the provision
necessarily incorporates the Act's narrower definition of "garbage" and its definition of "municipal
solid waste," further observing that rule 3.356 contains no definition of "municipal solid waste"
while the Act does. See Tex. Health & Safety Code Ann. § 361.003(20) ("'Municipal solid waste'
means solid waste resulting from or incidental to municipal, community, commercial, institutional,
or recreational activities, and includes garbage, rubbish, ashes, street cleanings, dead animals,
abandoned automobiles, and other solid waste other than industrial solid waste."). In several prior
rulings, the Comptroller has agreed that rule 3.356(a)(3)(E)'s reference to "garbage" incorporates
the Act's definition of that term. See, e.g., Tex. Comptroller of Pub. Accounts, STAR Document
No. 200312389L (effective Dec. 30, 2003) ("It is the definition of garbage in Chapter 361 of the
Health and Safety Code which the Tax Division maintains controls the taxability of waste removal
services in this case."); Hearing No. 42,854, STAR Document No. 200404692H (Apr. 16, 2004)
("[i]n Rule 3.356(a)(3)(E), the Comptroller has adopted for sales tax purposes the statutory definition
of industrial solid waste in Tex. Health and Safety Code, Chapter 361 ["Solid Waste Disposal
Act"]"). Although the Comptroller cites rule 3.356(a)(3)(E)'s "garbage" exclusion to emphasize that
she has not unqualifiedly adopted the Act's definition of "industrial solid waste" in her rule, we do
not understand her to be contending that Southern Plastics's waste, if "industrial solid waste,"
is nonetheless taxable because it is also "garbage." Instead, she joins issue with Southern Plastics
regarding the breadth of "industrial solid waste" under rule 3.356(a)(3)(E). 
3. E.g., scrap plastic, remnants of pulp, and liner "webbing." 
4. Merriam-Webster's Collegiate Dictionary 587, 999 (10th ed. 1994); Bryan A. Garner,
A Dictionary of Modern Legal Usage 430 (2d ed. 1995).
5. See supra note 2.
6. See Tex. Comptroller of Pub. Accounts, Hearing No. 39,987, STAR Document
No. 200208491H (Aug. 21, 2002).
7. In some of her pleadings, including her summary-judgment motion, the Comptroller refers
to the asserted failure of Southern Plastics to comply with rule 3.356(h)'s recordkeeping requirement
as a failure to meet its "burden" to recover a sales tax refund. In its third issue, Southern Plastics
characterizes these statements as misplacing the Comptroller's burden in her traditional summary-judgment motion, requiring Southern Plastics to prove its entitlement to a refund rather than
requiring the Comptroller to conclusively negate its entitlement. We understand the Comptroller's
position instead to be that Southern Plastics cannot, as a matter of law, recover on its refund claim
because the summary-judgment evidence conclusively establishes that it did not maintain or provide
"books and records" that could support its desired tax treatment of its waste, as required by
rule 3.356(h).
8. The Comptroller does not appear to dispute that Southern Plastics's waste generated
by the manufacturing process itself would be "industrial solid waste." However, she contends that
Southern Plastics's failure to comply with the recordkeeping requirements of rule 3.356(h) forecloses
its claim to a refund of any portion of the sales taxes it paid on waste removal during the
audit period.
9. See Tex. Comptroller of Pub. Accounts, STAR Document No. 9201L1162A01 (effective
Jan. 30, 1992) (even while "manufacturers must package and ship their products," "shipping
refuse relating to . . . manufacturing operations (i.e, packing and unpacking material, broken pallets,
etc.)" is not "industrial solid waste"); Tex. Comptroller of Pub. Accounts, STAR Document
No. 9209L1193F12 (effective Sept. 25, 1992) ("Industrial solid waste, as that term is used in
Rule 3.356, means waste products resulting from the actual manufacturing process, such as sawdust
from lumber mills, slag from a steel manufacturing process, or waste lumber [at a plant that
manufactures wooden doors and shingles]. 'Industrial solid waste' does not mean empty paint cans
or the discarded shipping refuse in which raw materials were received. Manufacturers can have
much more taxable waste than just the paper generated by the administrative staff."); Hearing
No. 33,600, Tex. Comptroller of Pub. Accounts, STAR Document No. 9601H1390B11 (Jan. 16,
1996) (cardboard cores used to support aluminum coils in shipment to plant that used coils as raw
material in manufacturing "are not waste products from an actual manufacturing process [but] fit into
the category of shipping refuse, and the collection of those cores is a taxable real property service.");
Hearing No. 43,049, Tex. Comptroller of Pub. Accounts, STAR Document No. 200610888H
(Apr. 20, 2004) (citing Hearing No. 33,600 in ruling that "discarded packaging and wrapping
material, including aluminum bandings, cardboard boxes, and plastic sheeting" was not "industrial
solid waste"). See also Tex. Comptroller of Pub. Accounts, STAR Document No. 200104170L
(effective Apr. 11, 2001) (food leftovers generated by office employees are not industrial solid
waste).
10. See Tex. Comptroller of Pub. Accounts, STAR Document No. 9201L1162A01 (effective
Jan. 30, 1992) ("Packaging or shipping refuse is free from regulation" under the Solid Waste
Disposal Act); Tex. Comptroller of Pub. Accounts, STAR Document No. 9209L1193F12 (effective
Sept. 25, 1992) ("Shipping refuse, empty paint, glue, and varnish containers are not regulated" under
the Act). Cf. 30 Tex. Admin. Code § 335.508(3) (Tex. Comm'n on Envtl. Quality) (all "plant trash,"
including trash from "facility offices" and "cafeteria," constitutes Class 2 industrial solid waste). 
11. The Comptroller presented the affidavit of Robert H. Krahn, the auditor who performed
the Comptroller's sales tax audit of Southern Plastics's Kilgore plant. Krahn testified that he
"examined the books and records of Southern Plastics" and that "[d]uring the audit, Southern
Plastics did not show me books and records documenting or classifying its waste stream for the audit
period [or] . . . show me any documentation showing that the waste generated during the audit period
was industrial solid waste." Krahn explained that "[t]he only documentation I recall seeing were two
pictures showing office trash, broken pallets, paper, or laminate skeletons resulting from the
manufacturing process." Krahn further testified that he examined the invoices for the waste removal
services Southern Plastics purchased from the City during the audit period. These invoices, as noted,
do not reflect the composition of Southern Plastics's waste stream.
12. Attached to Galliardt's affidavit was an excerpt from Southern Plastics's NOR, albeit
dated May 24, 2006. Beside "Description from Generator," the NOR indicated "General office,
cafeteria/breakroom, and misc. nonhaz plant waste/Generated through normal daily plant
activities/initial generation began on or after 8/24/92." Galliardt and the NOR do not elaborate
further on the relative proportions of each type of source of waste in Southern Plastics's total
waste stream. 


 Southern Plastics also presented a two-page spreadsheet entitled "Southern Waste
Inventory," filed with TCEQ, that indicates it was last revised in April 2006. It lists various 
categories of "Class 2" non-hazardous waste products :



 "Waste cardboard" generated "during packaging of final product prior to shipment."



 "Plant Trash" generated in "Office, Lunchrooms." The chart further states, "Any class 2
waste originating in the facility offices, laboratory, plant production area, or food service area
that is composed of cardboard, paper, linings, wrappings, paper and/or wooden packaging,
uncontaminated food waste, aluminum foil, aluminum scrap, empty containers with a
holding capacity of less than 5 gallons, uncontaminated food sweepings." 

 "Off Spec Product, Plant refuse" from "General Plant." It further states, "Supplemental Plant
Refuse: Any class 2 waste from production, manufacturing or laboratory operations as long
as the total amount of the supplemental plant production refuse does not exceed
twenty percent of the total plant trash . . . volume or weight, whichever is less. This could
include, but is not limited to, such things as metal parts, floor sweepings, and off
specification material."
13. The Comptroller has previously suggested that taxpayers who generate industrial
solid waste will ordinarily be required to file documentation with the TCEQ that will suffice
"to establish what portion of the waste is nontaxable hazardous waste, nontaxable industrial
solid waste, and taxable garbage or municipal solid waste." See Tex. Comptroller of Pub. Accounts,
STAR Document No. 200104170L (effective Apr. 11, 2001). However, if for some reason such
documentation is not required, the Comptroller emphasized that "the waste generator must still
establish what portion of their waste stream is nontaxable industrial solid waste versus taxable
garbage or municipal waste." Id. She further explained:


The waste generator can do this by identifying and documenting in writing those
processes that produce the various types and amounts of wastes. For example, a
waste generator that is a manufacturer determines that there are 150 office employees
and other employees that generate 100 pounds of office trash or garbage (e.g., food
leftovers, etc.) that is disposed of on a weekly basis. The incoming purchases of raw
materials and other supplies produce another 100 pounds of boxes and other
packaging waste for disposal each week. The actual output of industrial solid waste
from the manufacturing process is determined to be 200 pounds for disposal each
week. Therefore, the waste generator can show in this example that 50 percent of the
waste that is disposed of is nontaxable industrial solid waste and 50 percent is taxable
garbage or municipal solid waste by using process knowledge of the business
operation. Additional documentation that further supports the claim of exemption
can be kept; such as photographs of the amount and types of waste that are generated.


Id. However, the Comptroller stressed, "A single point in time 'check' of the contents of a dumpster
by a waste generator or consultant is not verifiable and is insufficient information to establish what
portion of the waste is taxable waste versus nontaxable waste." Id. 
14. See Hearing No. 44.501, Tex. Comptroller of Pub. Accounts, STAR Document
No. 200506292H (June 23, 2005).